We now have all parties in conference. Thank you, Erica. Case number 18-3217 Autumn Tangas v. IHOP et al. Oral arguments not to exceed 15 minutes per side. Ms. Conklin, you may proceed for the appellant. Good morning, may it please, or good afternoon rather, may it please the court. I'm Kimberly Conklin. I'm appearing this afternoon on behalf of appellant Autumn Lee Tangas. I reserve five minutes for rebuttal. This case is a claim for indemnification by the appellant for legal fees she incurred defending herself from a federal criminal investigation and indictment arising out of her employment with Appellees Dine Equity and IHOP LLC. The dispute here is whether appellant is entitled to indemnification under either the Dine Equity bylaws or the IHOP LLC membership agreement. Appellants have presented two assignments there that are, the district court erred in finding that appellant was not entitled to indemnification under either document and thereby granting summary judgment in favor of appellees. My intent this afternoon is to address the disputed issues as they relate to both documents, addressing first the Dine Equity bylaws and second the IHOP LLC membership agreement. As the facts are forth at length in our briefs, I will not restate them in full but rather will address facts as they relate to the issues presented. The first issue is appellant's entitlement to indemnification under the Dine Equity bylaws. I'm sorry, I thought I heard something, excuse me. The issue presented here is whether appellant was serving at the request of Dine Equity as an IHOP LLC and this is because the Dine Equity bylaws provide for mandatory indemnification for any person by reason of the fact that he or she was serving at the request of the corporation as a director, employee, etc. and so long as they were acting in good faith. The district courts agreed with Dine Equity's argument that because Tengas could not show, appellant Tengas could not show that she had a specific directive from Dine Equity to serve as an FBC that she could not prove she was serving at the request. This conclusion is not supported by Delaware law. The district court cited holdings from Von Felt versus Stiefel Financial Corp but as set forth in our brief, this case does not stand for the proposition that there must be an explicit directive. Rather, the Von Felt court especially cautioned against courts requiring an explicit indication or use of magic words. Rather, the... And Kemper, what facts do you think then most inform that overarching review? Your Honor, I think the facts are, and they're set forth in detail in our brief, the level of control that Dine Equity had and Tengas was an employee of IHOP Corp which then became Dine Equity for 15 years approximately before IHOP LLC existed. There was a code of conduct that and I cite to a lot of language in that document that basically said we're all one team. Applebee's and IHOP, you're a brand and you were all one team. We all serve Dine Equity. There was also the visit by the Dine Equity CEO that Ms. Stiefel testified about in which her market was toured. Tariq Al-Khafri, who was the subject of the criminal investigation and indictment, his restaurants were a particular part of the conversation where they said, look, you need to directly to appellant, you need to work on getting this guy where he needs to be. So I cite to a lot of those instances in the brief where there was complete control and this idea that we were all serving Dine Equity. So as the case law does not, does that answer your question Your Honor? Yes. Thank you. As the law of Delaware does not require the specific magic words for serving at the request, we believe those facts clearly establish that that appellant is entitled to indemnification under that Dine Equity agreement. The second issue is IHOP LLC's membership agreement and the sub-issues under this question is whether appellant was a covered person or did she cease being a covered person when IHOP fired her. Did the appellant engage in the bad? There's no dispute that she was at some point a covered person. The question is whether, and am I correct if the question is whether the rights vested or whether she ceased to be a covered person upon termination? Absolutely, Your Honor. The question is, and I believe through the briefs you can, I believe IHOP doesn't dispute that she was a covered person up until the point that she was terminated. Their contention is that as soon as they fired her, she was no longer a covered person and we believe that this is contrary to Delaware law. Number one, the agreement itself doesn't use former or current. The agreement defines a covered person as to basically stating you are a covered person if the conduct for which you seek indemnification arises by reason of your employment with the company. We liken it in our reply brief to an occurrence claim as opposed to a claims made, meaning if you were an employee and acting in good faith when this arose, you're entitled to indemnification. The district court's conclusion would mean that IHOP could always terminate the right to indemnification by just firing you. They would never have to indemnify anyone. They would just say, well, oh look, they're being investigated. We better fire him before we have to pay for their legal fees. And they've argued, well, we won't always do that, but it definitely undermines the contractual nature of this agreement. And I think we set that... If we agree with you on that, how do you satisfy the language that the act or omission doesn't constitute fraud, willful misconduct, bad faith, or gross negligence? Your Honor, the conduct, the fraud, the willful misconduct needs to arise from the claims for which indemnification is and the claims... It is undisputed that all charges were dropped against Ms. Tanga. She made two proper sessions and the charges were dismissed. The claims in the indictment are just not true, and a lot of them could be easily disproven. The fact that she's being accused of using her position as FBC to help Mr. Elk commit fraud, and there's absolutely no excuse to any of that. The conduct that I have complaints of is Ms. Tanga's failure to report the 2004 loan from Ross to Mr. Alkafrari, but that's not why she was indicted. She was indicted for mail fraud, she was indicted for harboring illegal aliens, and for basically using her position to help him, and that just simply was not true. Her failure to report this loan would not... Let's say she had reported it, she still could have been indicted on all the things that she's accused of. The other piece of conduct they point to is her refusal to participate in the investigation, but again, this is after the fact. She was investigated and indicted because of her role as the FBC, not because she didn't participate in the indictment. I think if you follow the language of the contract, there are two reasons, just don't hold up. And also, we would argue that there was no reasonable investigation into whether or not she committed fraud. I think Jennifer Ford, Dinequity, testified that she didn't conduct an investigation, that she read the indictment, she read the documents provided to her by the FBI, pretty much assumed they were true, and said no to any kind of amnification. I don't believe that's a reasonable investigation, especially when we show, and all the citations are there in our briefs, all the areas that were easily disproven by IHOP's own people, i.e. the allegation that Miss Tengas did not report an arson fire, the allegation that she requested special relief, all of those were easily disproven because, of course, IHOP knew that she did report the arson, and that she did not request that financial help. So, I believe that there are factual issues. If the court does decide that those allegations are related or arise from the indictment, I think there's a factual issue as to whether or not there was an investigation, and to whether or not she really was guilty of those things. My memory, and I'm not sure whether I'm correct or not, is that there was information in the briefing or in the record that Miss Tengas had to take her pension out, that this is a true indemnification because she took a loan against or took the assets from her retirement, and paid presumably an IRS penalty, and is seeking reimbursement for that. Is that correct? Well, she'd like to have her legal fees repaid. She did pay the legal fees by withdrawing everything from her retirement account, her 401k, I believe it was, and that's how she paid for it. So, yeah, she is seeking to be reimbursed for that loss. This is Judge Merrick. Were you the lawyer that she paid? No, Judge, I was not. She paid a Mr. Mezek out of Chicago to represent her. Ralph Mezek. If you have further questions, I'll go ahead and defer to my colleague and reserve the rest of my time for rebuttal. Let me ask you this. This is Judge Galtry. Did you argue to the extent that this would prevent a grant of summary judgment? Judge, the issue of the factual, as we, after we had briefed summary judgment, the district court asked us to specifically brief whether or not the Delaware business judgment rule applied. And in that argument, I think our first argument was no, that the contract controls, that this should be decided on what the language of the agreement says, that the business judgment rule should not apply. But then I believe, I do believe, Your Honor, that my alternate argument was that even if it does apply, there was no investigation here, and I cite all the, you know, the areas in the record where that was apparent. And that sort of arose after we finished briefing summary judgment. It was a second round of briefing. Well, I guess I was concerned about the fact that it occurred to me that whether there was bad faith here is a factual question for a jury to determine and not for Judge Carr. Judge, I mean, I agree with that. I think that under the contract, I mean, I think my first argument is that these accusations of bad conduct are not related to the indictment, but I agree with you. If the court were to agree that they are sufficiently related, that there should be a trial to determine whether or not Ms. Tangus actually did commit bad faith or fraud. Is there a question? No. Thank you. There's a question. Ms. Tangus, do you think then the, this is Judge Merritt, the case should be remanded for trial? My first request would be that the court find that, pursuant to the language of the agreements that she's entitled to indemnification, that if the court finds that the language does, if the court finds that the loan and the failure to participate in the investigation are related to the claims for which she is entitled, I think there needs to be a remand to determine whether or not there was fraud or willful misconduct. Thank you. You'll have your five minutes of rebuttal. Thank you. Good afternoon. This is Tom Dillon on behalf of the defendants at Appalese. Let me address one issue that was brought up in the case. There is no claim in this lawsuit that the defendants acted in bad faith. There's no breach of any implied duty of bad faith alleged in the amends complaint. And if you look at the conduct that is complained about, whether or not IHOP did enough to investigate the underlying claims that forced in the indictment, we don't think that's relevant because it's simply a contract case and the contract does not impose any standard as to which IHOP would need to follow as far as what it needs to do, what facts it needs to investigate or not investigate. And I'll explain a little bit why I think there really was no investigation needed because we're really relying on the admissions of Ms. Tangus. But let me revert back to where Appellant Counsel started and that's with the Dine Equity bylaws. So the main issue there is whether or not Ms. Tangus served at the request of Dine Equity. I think the facts are important with this. So Ms. Tangus started as a franchise business consultant back in 2003 and certainly there's no evidence that in 2003 Dine Equity requested that she serve in that role as franchise business consultant. And in fact they couldn't do that because Dine Equity didn't exist until 2007. Additionally if we look at the post Dine Equity absorption of both IHOP and Applebee's, Ms. Tangus claims in her briefing that it was a seamless transition and she kept doing the same job as she always did before. And there's no evidence that Dine Equity asked Ms. Tangus to apply to be a franchise business consultant or serve in that role at all. Isn't the Delaware law on that not so much that someone has to serve a formal request in order to have to meet the language that you're serving at the request but it is a fact-bound determination based on all the facts that are in the particular case. Isn't that a correct statement of law? Doesn't Von that it is the nature of a party's relationship that is at issue in making that determination. I agree that there needs to be facts but there are no facts here. Well what about what about what about the fact the argument that your opposing counsel makes that this was a one entity that the documents show that the entity was Dine Equity on behalf of its other names Applebee's and IHOP's that Julia Stewart remained the CEO continued to undertake the same activities but now on behalf of Dine Equity such that it was one entity. Well I think we're we're conflating the agreement so the Dine Equity bylaws only apply to Dine Equity period. There's no application to any. Yeah go ahead explain why you think the Dine Equity bylaws don't function here. Sure so they are the bylaws of a corporate entity and the only corporate entity in this case is Dine Equity. IHOP is a limited liability company and the and those bylaws cannot by definition apply to a limited liability company. A limited liability company is governed by its operating agreement not by another corporation's bylaws. I think we're the language. And I'm struggling with that because the was a violation of the Code of Conduct that is a Dine Equity Code of Conduct. Correct and I will move to that now and so. Explain to me the relations how can how can none how can none of the rules of Dine Equity apply if in fact you fired for violating the Code of Conduct of Dine Equity. Sure so the unlike the bylaws the Code of Conduct by its own terms applies to all employees of Dine Equity all employees of IHOP LLC and all employees of Applebee's. So they have all agreed upon a common Code of Conduct which we asserted in our brief is quite common. So that's why these are IHOP's. That's their Code of Conduct also. It's not just Dine Equity. It's shared amongst all the entities and there's nothing improper with that. Doesn't the record reflect that Miss Tangus was fired by Dine Equity? She was actually the record is that Christine's son who is an attorney employed by Dine Equity under a shared services agreement provides legal counsel to both IHOP and to Applebee's. I guess where I am is you're telling me about this tangle of relationships. One legal entity governs all of them. They share a Code of Conduct. Why aren't we in the land of trial rather than the land of summary judgment? Aren't those disputes as to how this functions? Disputes of fact that would prevent it from being an appropriate vehicle for resolution by summary judgment? We don't believe so and in fact there's no claim whatsoever that the corporate veil between IHOP and Dine Equity should be pierced. There's simply no claim that there's any fraudulent or improper conduct that would cause a court to disregard the corporate status of Dine Equity and the limited liability status of a totally owned subsidiary. They are treated as separate entities. Now there are facts if you look at the case law where one entity will affirmatively go to the other and an employee of its own and will direct one of its employees to do some work for a related entity. We don't have that here. That would be a case in which a Dine Equity employee would be directed to go and do something for IHOP? Is that what Ms. Stewart's doing if not engaging directly with oversight and control of Ms. Tangus? Thank you. Yeah she talked with her about the problems with the elk franchises. She told her what to do about it. I'm struggling with your distinction among these entities. How did she have the capacity to do that unless she was authorized to do so by a corporate relationship? Sure. So if you look at that event and when it happened, it happened in 2004. So at the time Ms. Stewart was the CEO of IHOP Corporation in 2004 and again Dine Equity didn't exist until 2007. So her encouragement of Ms. Tangus to do her job and keep an eye on this particular franchisee happened when Ms. Stewart was the CEO of IHOP. What was Ms. Stewart's role in the issues surrounding the discharge? I don't believe she had any role that I've seen. And when did her role with the elk franchises cease? I don't have that fact. The only involvement that I'm aware of through the record created in this case was back in 2004 where there was a discussion about elk and then later her involvement was that there was an award given to Ms. Tangus and on the award had the logos of Dine Equity, IHOP and Applebee's. I'm sorry proceed. Thank you. With regard to the IHOP operating agreement, I believe the argument is being made that the exclusion for fraud and willful misconduct for indemnity really doesn't apply because the loan that Ms. Tangus or a partner gave to Mr. El Caprari was not disclosed. I think the argument has been that that can't form the basis of an exclusion because that loan is not an element of a money laundering claim or immigration violation claim. And our point to that is that we believe the brief is suggests that it needs to be related to an element of the criminal charge and that's just not correct. The term claim is defined under the indentification agreement and it really provides for all types of losses, claims, demands, liabilities, etc. arising from any and all claims, demands, actions, suits or proceedings, criminal, civil, administrative or investigative. So we're really the fact that this loan was absolutely part of the criminal proceedings. It was in the indictment. It was evidence that the prosecutor set forth or brought forward to try and prove collusion between Ms. Tangus and the We don't need to prove every single allegation that the prosecutor put in the indictment. In fact, I don't think we need to prove anything. The only thing we are relying on are things that Tangus has admitted. She admits that her partner made the loan out of a joint bank account. She admits that the code of judgements on the company behalf or might even create the appearance of impropriety. She admits that the loan ran contrary to her role as an FBC and could be perceived as unethical. She admits that you're supposed to report actual or potential conflicts of interest to the compliance officer under the code of conduct. And she admits that she never reported that. So our position... I understand the basis of your argument. I'm struggling a little bit with the actual practical issue of indemnification because the money that she expended did not have to do with something that happened in 2004. It had to do with the indictment. So help me understand how you weave through there when what she was indicted for were distinct from her five-year-old wrongdoing. Well, the indictment goes through the whole loan. The FBI put out there is that she was compromised. Her role as an FBC was compromised as a result of... I'm sorry, who put the conclusion out there? I'm saying if you read the FBI notes and the indictment, that's the inescapable conclusion. I'm not quoting words that appear in the indictment. So I'm not and the context of that whole loan and the discussion of the loan is that Ms. Tangus, because of that loan, if her employer knew about it, they might have terminated her. Why? Because she's compromised. And since he had... Elk Flowery had that fact, she could not be independent. And therefore, that whole mess happened, really, because she didn't come forward. She would not have been involved in Elk Flowery if she had come forward and advised us. You would have either eliminated her, right, or you would have moved to a different franchise base where she wouldn't have to interact. How do you explain, then, that her response and the information she provided the government on the basis of the indictment resulted in her not being further prosecuted, that the indictment was dropped as to her? Yeah, so there's no evidence in the record as to why that was indicted. It was actually dismissed without prejudice, and we don't know why. And so there was a statement in the brief basically saying that she was cleared of all misconduct, and I guess I wouldn't go that far. I don't think that's really accurate. I mean, the indictment against her was dismissed without prejudice. Why? We don't know. There's nothing in the record to establish that. Judge Merritt, I guess it could have been that the government looked at his case and concluded that, based on the facts, they couldn't get a conviction or something like that. I don't know. I guess I wouldn't want to speculate. Judge Trench, Mr. Dillon has exhausted his time, just so you know. Oh, thank you. We'll continue. Judge Merritt has a question. Well, that's okay. Nobody knows why all this happened, I guess, basically. No explanation? There has been no explanation put in the record as to why the prosecutor did what he or she did. Help me understand your argument about the IHOP LLC agreement indemnification provision. What case law is it that you rely on for your discharge from employment? So, we actually cited quite a bit of case law that you don't need any indemnification. Unlike a corporate entity in Delaware, the Delaware LLC does not need any. It's 100% up to the LLC. So you can draft it any way you want. You can make it as limited as you want. You can withdraw it contractually, however you would like to do that. So, since it's not a required benefit, we believe that it's controlled exclusively by the words contained in the operating agreement. We also cited, and I'm struggling to find the case, I apologize for that, but the case basically says that if the language does not contain the word former, then the court should construe it that it only applies to current. And I believe I now found that case. Are you talking about Charney? Charney. Are you talking about Charney? I have a real concern about the conclusions drawn on that case. The Charney case has a single paragraph in which it is looking at an article, Article 8, and the single paragraph in Charney says, the first sentence of Article 8 says, and then it goes on and says, the second sentence of that very same article simply says officers or directors without former or prior in it. And so what it concludes is where you have one sentence following the other, if the first one uses a broader definition and the second one excludes those words, then we have to assume it did so intentionally. But what you're doing, the way you've used the case, is to say I'm going to look at the IHOP LLC, which you have told me is a completely different entity, and I'm going to say that covered person can't mean someone who was covered, and I know that because Don Equity's bylaws tell me that. I'm really struggling with not only the fact that you've said they are completely separate entities, but the fact that you're using language from Don Equity's separate document in order to understand or to draw a conclusion about IHOP's LLC. I don't see how that works. Our position is that the IHOP operating agreement is clear and unambiguous. We know what an employee is. An employee is someone who is receiving a paycheck, a W-2, all those things. A person who can contribute to the company 401k, who can be on the health insurance,  and Ms. Tangus was not when she incurred these expenses. Doesn't that leave you in the position that your opposing counsel argues that if you have this indemnity provision and the way to absolve yourself of that liability is simply to fire the person as soon as you know there's a problem? How does that work practically? How do you have indemnity if all you have to do is fire them and you absolve yourself of your indemnification responsibility? Well, you could do that. It's a limited benefit. And the case law in Delaware talks about why do we have indemnity, why do we have insurance, directors and officers insurance, why do they have these benefits to protect people who are serving in these roles? And the answer is if you don't have those, you're going to have a hard time recruiting people. So, you know, counsel can be critical of this benefit and say it's not good enough, it ends. But I would say lots of benefits end. If I'm no longer employed with my company, I can no longer contribute to my 401k. There's lots of benefits that end. My struggle is that the whole concept of indemnity has to do with expenditures of employees in situations where they were acting on behalf of or for the corporate entity. And I'm struggling with the idea that you can cut that off, particularly in light of Delaware law that does two things. The statute itself presumes that states that statutory indemnity continues post-employment. And the case law says that we look at the words covered employee and we presume that those employees that are covered can invest in the right to indemnification, even if they're no longer employed. Doesn't Delaware case law support that analysis? I believe you're going down the road of section 145 of the Delaware corporate code. That can only apply if the Dine Equity Bylaws apply. It is completely irrelevant to an LLC's operating agreement. There is no such corollary under Delaware's limited liability law. Then Delaware's, the law of contract interpretation of who a covered person is outside the statutory provision. Isn't there Delaware case law in which it says? In which it says that there's any right... There's no case law... In which indemnity provisions vest and are applicable post-termination. No, I guess I don't agree with that. I don't think the concept of vesting... I don't... Technically using that term in its technical sense, I don't think applies at all. It's whether or not an employee benefit, does it exist, yes or no? And that's a matter of contract interpretation. There is zero public policy involved. If you're talking about indemnification of a corporate employee, different ballgame altogether. Further questions? No. Further questions? Thank you, Counselor. Thank you. I think, Your Honors, I would like to address the discussion about the testimony or whether there's anything in the record to suggest why the claims in the indictment were discharged as to Ms. Tengas. And I think there is testimony from Ms. Tengas. There are a lot of documents from the FBI. What Ms. Tengas testified to, both in affidavit and I believe in her deposition, is that the case was indicted because none of it was true. She did not collude with Mr. Elk. She did not help him defraud IHOP. Most of the things that she was accused of doing in the indictment were not even things that she could have had access to during her job, such as misreporting workers' comp claims and hiring of illegal aliens. She had no back office access in that way. She was dismissed because nothing in that indictment was true. She acknowledged, in fact, she brought to the FBI's attention this loan to Terry Elk back in 2004, and it was an example of why she knew this guy had money problems. And she acknowledged that as soon as she found out about it, she was furious, and she made her partner get that money back, and she confronted Mr. Elk about it. And that testimony is in the record. Exactly, she did know that it was not something that was good for her job. She didn't report it because she, at the time, she testified that all investments had to be reported. She did not consider it to be an investment. She wanted it put out of, as soon as the money was back, she didn't want to think about it anymore. Maybe that was the wrong decision. But, I mean, I guess the idea that she would have been terminated or that she wouldn't have been moved from the Elk account, I mean, that's speculation. Maybe that's true. But there's certainly nothing in the record as to that. The counselor took nine months to get the money back, didn't it? It did. It did. And there's no question that she was upset about that. And then when it was over, it was over. And I think, Your Honor, the record is that she never let up on Mr. Elk. Her reports, there's no evidence that she ever let that incident cloud her judgment in any way. The indictment says that her partner was getting insurance, that her partner was getting paychecks. There's not one iota of documentation to support any of that. It was never true. In fact, the documentation that we presented in this lawsuit was that Ms. Tangus was very critical of Mr. Elk. She worked hard. She complained about him. She wrote reports. She pushed her boss about, why are we giving this guy breaks? You know, the evidence was that she never let up on him. And I think that the language in the agreement, I will agree with my colleague, in that I think this is a contractual matter. And the contract says at 8.2, and I'm referring to the IHOP LLC agreement, coverage is, however, excluded for claims arising from the covered person's fraud. So claims arising from the fraud. I just don't believe that the claims in the indictment, meaning that she used her job to help Mr. Elkafari steal money and commit crimes, those do not arise from this loan. And to the extent there's the allegation that her failure to comply with the investigation was willful misconduct, again, that claim does not, that conduct does not arise from the claims in the indictment. The other issue, and I will address, is the Brannon decision, Your Honor, that you were referring to the Delaware law. Brannon and Solomon? I'm sorry? The Brannon and Solomon decision. I'm not familiar with Solomon, Your Honor, but I am referring to Brannon v. Stein in which the court held that once the right to indemnification vests, it cannot be modified. And there's no question that that was not about a termination. It was about a subsequent modification to the LLC agreement. But I think that it's a difference without distinction. The question is, once that right vests, can it be unilaterally extinguished? And the Chancery Court in Delaware said no, it cannot. So you can't extinguish that right by termination. Otherwise, you've got an illusory contract. I mean, I know benefits end when you get fired, but this is a promise that if we send you out to work with these people and you get indicted because these people are criminals, we're going to defend you, and then, well, we're going to fire you and we're not going to honor that promise. I mean, that's not a contract. That's an illusion, and it's just not enforceable under Delaware law. Subject to your questions, I will address some arguments presented in our briefing. I have one other question on Delaware law. My understanding is that it generally requires an examination of the merits before addressing an indemnification dispute. Is that correct? Your Honor, a lot of this case law relates to the mandatory indemnification provisions for corporations and corporate officers. I believe that in an investigation, I believe that Delaware law supports this idea that you have to actually go out and look at the merits and look to see what the conduct was, not just read allegations. I believe that that is what Delaware law requires. I don't believe that that was done in this case. I'm not making, and Mr. Dillon pointed out, that there is no claim for bad faith, and he is absolutely correct. We have not alleged bad faith. What we have said was, to the district court's question of whether this business judgment rule should be honored, my answer was no. There was no reasonable investigation into whether or not Ms. Tangus actually deserved to be indemnified or whether she engaged in the fraud that led to this indictment. There was similarly... The business judgment rule is not going to apply. Doesn't it apply only when there's no contract? I would say so, absolutely, yes. The contract applies. The contract applies, and so I guess the question is, if there is... I can understand how it would be unnecessary to examine the merits if everything were agreed upon, but where we have a dispute of material facts, my question is, is that where we are here? Are we at a dispute of material facts regarding the merit of indemnification? Your Honor, if the court agrees with Mr. Dillon that the loan and the failure to participate in the agreement or in the investigation are excludable as bad conduct, then I agree that we have to go have a trial to determine whether or not that was fraud or misconduct. I think that the contract says that the claims need to... for which you seek indemnification, fraud cannot arise from those claims, and my first contention is that this loan did not lead to the indictment. But if the court disagrees, I absolutely think there needs to be a trial to determine whether or not Ms. Tangus' conduct excludes her from the right to indemnification. Further questions? Thank you, Counselors. Your case will be taken under advisement, and we will render a decision in due course. We appreciate your briefing and argument. Thank you very much. You may adjourn the Court. Erica? Yes, sir. If you could just verify when the attorneys, Ms. Conklin and Mr. Dillon, have disconnected. Yes, sir. Disconnecting now. Okay, both parties have disconnected. And Judge Stranch? Yes. Normally we would place you in a sub-conference to confer, but obviously that's not necessary given that the three of you are there. So unless you have questions for me... Unless you have questions for me, I'll just disconnect from the courtroom, and you can disconnect from there. Thank you so much. Thank you, Judge. Bye-bye. Bye.